## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CUYAHOGA COUNTY, *et al.*, | ) | CASE NO. 1:08-CV-01339 |
| | ) | |
| Third Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE GREG WHITE |
| STATE AUTOMOBILE MUTUAL | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Third Party Defendant. | ) | **MEMORANDUM OPINION & ORDER** |

On July 9 and 10, 2012, with the consent of the parties, this Court conducted a bench trial in the above captioned case.  (ECF Nos. 261-262.)  Third Party Plaintiff Cuyahoga County (hereinafter "the County") filed its post-trial brief on August 7, 2012.  (ECF No. 266.)  Third Party Defendant State Automobile Mutual Insurance Company (hereinafter "State Auto") filed its post-trial brief on August 21, 2012.  (ECF No. 268.)  The County filed a reply on August 31, 2012.  (ECF No. 270.)  Closing arguments were heard on October 16, 2012.  This matter is now ripe for adjudication.  The County also filed a Motion for Leave to Amend An Admission, which State Auto opposed.[1]  (ECF Nos. 265, 276, 269.)  For the reasons set forth below, judgment is entered in favor of Defendant State Auto.

---

[1] The parties dispute whether the enactment of prescription drug verification guidelines at the Cuyahoga County jail by Midwest Medical Staffing, Inc. ("MMS"), State Auto's insured, constituted professional services and further dispute whether the insurance policy provided for a professional services exclusion.  Because the Court finds that there was a failure to prove a 42 U.S.C. § 1983 violation on the part of MMS, the County would not be entitled to indemnification from State Auto.  As such, the professional services dispute is immaterial.  The County's Motion for Leave to Amend An Admission (ECF No. 265) is DENIED as moot.

## I.  Procedural Background

This matter began as a wrongful death action by Plaintiff Angela Lowe, individually and as administratrix of the estate of her late husband, Sean Levert, who died as a result of complications from Xanax (benzodiazepine) withdrawal while in custody at the Cuyahoga County jail.  (ECF No. 99.)  The Fourth Amended Complaint, filed on April 7, 2010, specifically alleged the following causes of action: a deprivation of decedent's rights pursuant to 42 U.S.C. §1983; wrongful death under Ohio law; malpractice against physicians and nurses of the Cuyahoga County Jail; negligence against Defendants Midwest Medical Staffing and Dr. Emmanuel Tuffuor; negligence against Defendants Cuyahoga County, Sheriff Gerald McFaul, Kenneth Kochevar, and Christine Dubber; and, loss of consortium.  *Id*.

On May 21, 2010, the County filed cross-claims against Defendant Midwest Medical Staffing (hereinafter "MMS") alleging common law indemnity or contribution and breach of contract.  (ECF No. 118.)  The County also filed a third-party complaint against State Auto asserting that the County is entitled to a defense and indemnity as an additional insured under a general liability policy issued to MMS by State Auto.  *Id*.

On June 16, 2010, after mediation, the parties reached a contingent settlement disposing of all claims except the County's claim against State Auto.[2]  (ECF No. 141.)  Jonathan Mount attended the mediation as a representative of State Auto.  (ECF No. 141-1.)

On October 18, 2010, State Auto filed a Motion for Summary Judgment.  (ECF No. 163.)  The County and related Defendants filed a Motion for Summary Judgment as to coverage issues on November 15, 2010.  (ECF No. 165.)  On December 9, 2010, District Court Judge, Donald C. Nugent, denied State Auto's Motion for Summary Judgment.  (ECF No. 167.)  On December 20, 2010, State Auto filed a brief in opposition to the County's motion and a Cross-Motion for Summary Judgment.  (ECF No. 172.)  The County filed a brief in support of its motion and opposing State Auto's cross-motion on December 28, 2010.  (ECF No. 173.)  On February 9,

---

[2]  All claims but those against State Auto were ultimately dismissed on December 28, 2010.  (ECF No. 174.)

2

2011, Judge Nugent granted the County's motion for summary judgment while denying State Auto's cross-motion. (ECF Nos. 178-79.)

On February 23, 2011, State Auto filed a Motion to Amend Judgment, followed by a Motion for Reconsideration and Motion to Alter/Amend Judgment on March 7, 2011. (ECF Nos. 180, 181.) On March 31, 2011, Judge Nugent denied all of State Auto's motions. (ECF No. 185.) Four and one-half months later, State Auto filed a second Motion for Reconsideration. (ECF No. 211.) After referral, this Court recommended that the motion be denied. (ECF No. 229.) The recommendation was adopted on January 6, 2012. (ECF No. 232.)

The parties filed their trial briefs on June 12, 2012, and their proposed findings of fact and conclusions of law on June 14, 2012. (ECF Nos. 245-46, 248-50.) Thereafter, supplemental briefs were submitted at the Court's direction. (ECF Nos. 254, 257, 260.)

## II. Analysis

### A. Duty to Indemnify

The County, in its Complaint, asserts that it is entitled to indemnification pursuant to MMS's contract with State Auto and that "it would be entitled to judgment against State Automobile for any liabilities arising out of 'non-professional acts.'" (ECF No. 118 at 15-16.)

An insurer's "duty to indemnify is tied to the insured's *actual legal liability*." *Ferro Corp. v. Cookson Group*, 561 F. Supp. 2d 888, 909 (N.D. Ohio 2008) (emphasis added), *citing AMCO Ins. Co. v. Lauren-Spencer, Inc.*, 500 F.Supp.2d 721, 726 (S.D. Ohio 2007); *Pilkington N. Am., Inc. v. Travelers Cas. & Surety Co.*, 112 Ohio St. 3d 482, 487, 861 N.E.2d 121 (Ohio 2006) ("The duty to indemnify arises from the conclusive facts and resulting judgment.") "However, the Ohio Supreme Court stated that when an indemnitee settles a claim, instead of litigating it, the indemnitee is entitled to indemnification if the indemnitee shows: (1) that the indemnitee has given proper and timely notice to the party from whom indemnity is sought; (2) that the indemnitee was legally liable to respond to the settled claim; and (3) that the settlement was fair and reasonable." *Portsmouth Ins. Agency v. Medical Mut. of Ohio*, 934 N.E.2d 940, 188 Ohio App. 3d 111, 117-118 (Ohio Ct. App., 2009), *citing Globe Indemnity Co. v. Schmitt* (1944), 142 Ohio St. 595, 53 N.E.2d 790."); *accord DeMarco, Inc. v. Johns-Manville Corp.*, 2006 Ohio

3

App. LEXIS 3527, 2006-Ohio-3587 at ¶20 (Ohio Ct. App., July 13, 2006) ("However, after making a voluntary settlement, the indemnitee is required to show 'he was legally liable and could have been compelled to satisfy the claim.'")

###### 1.    Legal Liability of the County

Before addressing whether State Auto received proper and timely notice or whether the settlement agreement reached was fair and reasonable, the Court will first address the second requirement for indemnification – whether the County was legally liable to respond for the acts of MMS.  It is undisputed that the County and its employees were "additional insureds" under the express terms of the policy.  This was confirmed by the trial testimony of Debbie Schonauer – a senior quality assurance analyst with State Auto.[3]  (Tr. 226, 228; 3rd Party Pl.'s Exh. 127 at 5.)  Here, the State Auto policy with MMS states as follows:

> A.    Section II - Who Is An Insured is amended to include as an additional insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy.  Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:
>
> 1.  Your acts or omissions; or
>
> 2.  The acts or omissions of those acting on your behalf;
>
> in the performance of your ongoing operations for the additional insured.
>
> A person's or organization's status as an additional insured under this endorsement ends when your operations for that additional insured are completed.

(Exh. 127 at 60.)

Although this issue does not appear to be in contention, the Court finds that the County is

---

[3]  Also, in its cross-motion for summary judgment, State Auto conceded that "it is undisputed that the Cuyahoga County and its employees are listed on the State Auto policy as named additional insureds, [but that] the policy extends coverage to such an additional insured only with respect to liability for 'bodily injury' caused by the alleged acts or omissions of MMS or its agents in the performance of its ongoing operations for the Cuyahoga County Defendants ..."  (ECF No. 172.)

only entitled to indemnity from State Auto to the extent that legal liability flows from acts or omissions of MMS and its employees, and *not* from any liability stemming from the conduct of the County or its own employees under § 1983.  Furthermore, pursuant to Ohio Revised Code ("O.R.C.") § 2744.02, the County, as a political subdivision "is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function" unless an express statutory exception applies.  However, none of the exceptions are applicable to the case at bar.[4]  Therefore, the County's legal liability must not only stem from acts or omissions by MMS and its employees, but such acts or omissions must result in liability under § 1983.  The County appears to concede as much.  In its Trial Brief, the County explains its theory of the case as follows:

> The violation of the Eighth Amendment rights of Sean Levert makes Midwest Medical liable *since it violated Title 42 Section 1983*.  Because the County is responsible for the operation of the jail, it shares liability for those policies.  If the jail policies of Midwest Medical Staffing caused damage to decedent Levert, the State Auto policy issued to Midwest Medical Staffing, naming the County as an additional insured, is responsible for indemnification under that insurance policy, not only to Midwest Medical Staffing, but to the County.  *The substance of this case is that the jail policy caused the death*, and the injury is covered by the

---

[4]  *See Samples v Logan County*, Case No. C2-03-847, 2006 U.S. Dist. LEXIS 320 at **36-37 (S.D. Ohio Jan. 6, 2006) (explaining that O.R.C. § 2744.02(B) expressly provides five exceptions to political subdivision immunity: "damage caused by the negligent operation of a motor vehicle [(B)(1)]; damage caused by negligent acts of a political subdivision's employees with respect to its proprietary functions [(B)(2)]; damage caused by failure to keep roads in repair or from failure to remove obstructions from public roads [(B)(3)]; damage or injury caused on the grounds of buildings used in connection with the performance of a governmental function, but not including jails [(B)(4)]; and where civil liability is expressly imposed upon a political subdivision by the Revised Code [(B)(5)].")  The second exception dealing with proprietary functions is clearly inapplicable as well, because, by definition, a proprietary function "involves activities that are customarily engaged in by nongovernmental persons." O.R.C. § 2744.01(G)(1)(b).  Although O.R.C. § 2744.02, sometimes called the Liability Act, has been challenged as unconstitutional, "the Sixth Circuit has found the Liability Act to be constitutional because a majority of the Supreme Court of Ohio has never held the statute unconstitutional and because Ohio's intermediate courts are unanimous in upholding the statute." *Spangler v. Wenninger*, 2008 U.S. Dist. LEXIS 86369 (S.D. Ohio Sept. 3, 2008), *citing Ellis v. Cleveland Mun. School Dist.*, 455 F.3d 690, 697 (6th Cir. 2006).

5

insurance policy, to the benefit of the County.

(ECF No. 246 at 3) (emphasis added).

During closing arguments, the County did not advance any other theory of liability. Thus, the dispositive issue with respect to liability is whether the policies and customs established by MMS rise to the level of deliberate indifference resulting in § 1983 liability for the County.

**2. Liability Arising Under § 1983**: **Constitutionality of the Verification Guidelines**

The County claims that it was the jail policies, specifically the "Booking Guidelines," Plaintiff's Exhibit 73, promulgated by MMS, that caused the death of Sean Levert.  (Tr. 6; ECF No. 246 at 1-3.)  According to the testimony of nurse Christine Dubber, employed by the County as the manager of health care services at the Cuyahoga County Corrections Center (hereinafter "the jail"), the jail policies and procedures, including the Booking Guidelines, were developed and approved by the medical director.  (Tr. 29, 31, 38-39.)  At the time of Mr. Levert's death, Emmanuel Tuffuor, M.D., an MMS employee, was the medical director at the jail.  (Tr. 192.) The Booking Guidelines, found in Exhibit 73, were in place at the time of Mr. Levert's death. (Tr. 31-33, 206.)  In relevant part, the Booking Guidelines state the following:

I.       REGARDING MEDICATION VERIFICATIONS

   A.     All medications from the treating MD or pharmacist should be
          verified by medical personnel including the intake staff, the
          dispensary nurse, the nursing supervisor, or the assistant director
          of nursing.  Documentation must include the dose, last time given,
          and whether the meds are used daily or on p.r.n. basis.

          Verified meds should be ordered for 30 days.  (Please refer to II
          for more guidelines.)

   B.     If medications cannot be verified, please indicate so in the
          observation column of the order sheet.

          Nonverified meds can be ordered for 14 days.  (Please refer to II
          for more guidelines.)

          Inmates with nonverified psychiatric medications should be
          referred to the mental health nurse.

   C.     Refer inmates/patients to be seen by the dispensary MD within 7-
          10 days for management of medications and/or treatment if the
          situation is not urgent.  If the situation is urgent, schedule the

6

inmate for emergency sick call the same or following day.

II.      MEDICATIONS THAT CAN BE ORDERED BY THE NURSE.

    A.    Antihypertensives
    B.    Cardiac meds
    C.    Antiseizure meds
    D.    Insulin or oral hypoglycemics
    E.    Antibiotics if inmate/patient still symptomatic (complete the course of treatment only)
    F.    HIV meds
    G.    Antipsychotic drugs
    H.    Meds used in transplant patients, e.g., cyclosporin, steroids, immuran
    I.    Meds for bronchial asthma may be ordered if patient is symptomatic, e.g., SOB, wheezing, hypoxemia, or clinical findings of bronchospasm; there should be no routine orders of inhalers per request.
    J.    Antipeptic meds if the inmate has recent upper GI bleeding within last three days.

III.     MEDICATION ORDERS THAT SHOULD BE POSTPONED UNTIL THE INMATE HAS BEEN SEEN BY THE M.D. IN THE DISPENSARY

    A.    All pain meds, e.g., motrin, codeine, derivatives, etc.
    B.    Meds for headache.
    C.    Meds for insomnia.
    D.    Routine Tagamet or Zantac or other antipeptic ulcer meds.
    E.    Routine inhalers.
    F.    Routine multivitamins or dietary supplements, e.g., Ensure
    G.    ATB for asymptomatic patients, except for patients with TB, AIDS or transplant patients.
    H.    Routine antidepressants, e.g., prozac, doxepin, etc.

(Exh. 73) (hereinafter "verification guidelines").

The Sixth Circuit has explained that a local government entity, such as the County, violates § 1983 where its "official policy or custom actually serves to deprive an individual of his or her constitutional rights." *Id*.

A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers. *Id*.  Where the identified policy is itself facially lawful, the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.  A showing of simple or even heightened negligence will not suffice." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) (quoting *Harris*, 489 U.S. at 388 (1989)).  "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410.  In other words, the risk of a constitutional violation arising as a result of the inadequacies in the

municipal policy must be "plainly obvious." *Id*. at 412; *see also Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997).

*Gregory*, 444 F.3d at 752-753. Therefore, "'municipal liability under § 1983 attaches where -- and only where -- a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 483-484 (1986); *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)); *King v. Marion County Sheriff's Dep't*, 2010 U.S. Dist. LEXIS 64205 (E.D. Tenn. June 28, 2010) ("Plaintiffs must identify the policy, connect the policy to the county itself, and show the particular injury was incurred because of the execution of that policy.") As explained in *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700 (11th Cir. 1985), the County could be found liable if the policy implemented by MMS, and essentially adopted by the County, rose to the level of deliberate indifference:

> The federal courts have consistently ruled that governments, state and local, have an obligation to provide medical care to incarcerated individuals. *See Estelle, supra*. This duty is not absolved by contracting with an entity such as Prison Health Services. *Although Prison Health Services has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the Health Service*. In that sense, the county's duty is non-delegable.

*Id*. at 705 (emphasis added); *see also Moldowan v. City of Warren*, 578 F.3d 351, 394 (6th Cir. 2009) (although Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort, this "official policy" requirement did not preclude municipal liability "for a single decision by municipal policymakers under appropriate circumstances.") (*citing Pembaur*, 475 U.S. at 469.) By allowing MMS to establish and implement policies and procedures for the non-delegable responsibility to provide adequate healthcare to inmates, the County, by law, assumed those policies and procedures as its own.

The Court, however, must determine whether the drug verification guidelines were facially unconstitutional as written or articulated, **or** whether the policy was facially constitutional but consistently implemented to result in constitutional violations.

8

### a. Facial Constitutionality of the Verification Guidelines

The County consistently characterizes the verification guidelines at the jail as a policy to "take away the Xanax" or a "confiscation policy."  (ECF Nos. 246 at 4; 266 at 14.)  Reading the policy as a whole, it is clear the intent of the verification guidelines was not to deprive inmates of their medication, but rather to verify that any medication inmates brought with them was properly prescribed.  After verification, inmates are to be provided with the appropriate medication.  As discussed below, Mr. Levert's death resulted, in part, from the failure by County employees – not MMS employees – to take appropriate steps to verify his Xanax prescription.  The Court considers the testimony of expert witness James Knoll, a board certified psychiatrist with experience as a treating psychiatrist in a jail facility and as the medical director for the state of New Hampshire, to be significant.  (Tr. 134-37.)  Notably, Dr. Knoll testified that prescription medicine verification is a common policy in the field of correctional health care, and that it is motivated mostly by security concerns.  (Tr. 147, 158.)  In addition, Dr. Knoll testified that the policy of taking a patient's medication until it can be verified is customary even in civil hospitals.  (Tr. 158-59.)  Dr. Knoll took no issue with the general policy of taking away medication prior to verification.  (Tr. 186.)

Though a policy that is common among both correctional facilities and hospitals is not automatically constitutional, the prevalence of such a policy favors a finding that verification guidelines do not rise to the level of deliberate indifference on their face.  The County's argument that the verification policy was facially unconstitutional also runs contrary to precedent.  In a recent case not cited by either party, the Sixth Circuit observed that "there is no per se constitutional objection to reasonable policies that regulate the access of prisoners to controlled substances, including prescription drugs." *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 778 (6th Cir. 2012) (*citing Bell v. Wolfish*, 441 U.S. 520, 540 (1979) (recognizing that reasonable restraints imposed by a prison to "make certain no ... illicit drugs reach detainees" do not constitute violations of the Eighth Amendment)).  Therein, the Sixth Circuit explicitly agreed with the district court that a stricter seizure and verification policy than the one found herein was not tantamount to deliberate indifference.  *Id*. at 778.  The Court has not been presented with any

evidence that would justify finding that the verification guidelines in effect at the time of Mr. Levert's death were so woefully inadequate and so prone to result in deliberate indifference that they were facially unconstitutional.

### b. Constitutionality of Verification Guidelines As Implemented

The Court next turns to the more difficult question of whether the verification guidelines were consistently implemented to result in constitutional violations with explicit or implicit ratification by county policymakers.  Where the identified policy is facially lawful, as here, a plaintiff must demonstrate that the governmental action was taken with deliberate indifference as to its known or obvious consequences.  A showing of negligence, even heightened negligence, is insufficient.  *Gregory*, 444 F.3d at 752-753.  "Deliberate indifference requires a degree of culpability greater than mere negligence, but less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Border v. Trumbull County Bd. of Comm'rs*, 414 Fed. Appx. 831, 836 (6th Cir. 2011) (*quoting Perez v. Oakland Cnty.*, 466 F.3d 416, 424 (6th Cir. 2006)).  This inquiry is comprised of both objective and subjective components:

> There are two distinct prongs of the deliberate indifference standard: An objective component and a subjective component.  First, the medical need "must be, objectively, sufficiently serious."  *Farmer*, 511 U.S. at 835. [...]  The subjective component, on the other hand, requires facts that indicate "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."  *Comstock*, 273 F.3d at 703.
>
> Thus, the subjective component actually has three prongs embedded within it.  First, the plaintiff must show that the official subjectively perceived the facts  that gave rise to the inference of the risk.  *Id.*  Then, the plaintiff must show that the official actually drew the inference, and, importantly, not just that he or she should have done so.  *Farmer*, 511 U.S. at 839; *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994).  Finally, the plaintiff must show that the official consciously disregarded the perceived risk.  *Farmer*, 511 U.S. at 839.

*Cooper v. County of Washtenaw*, 222 Fed. Appx. 459, 465-466 (6th Cir. 2007).

Whether MMS, acting on behalf of the County, disregarded a known or obvious consequence of the verification guidelines, or whether the alleged inadequacy of the policy was plainly obvious, depends in large part on whether the verification policy was known to result in breakdowns similar to that which occurred herein.  In fact, another district court in this Circuit

10

has found that "to be successful on [a] municipal liability claim, plaintiff will be required to establish that there were other ... jail inmates who, like [plaintiff], received inadequate care for a serious medical need as a result of a policy implemented by the defendant policymakers." *Marcum v. Scioto County*, 2012 U.S. Dist. LEXIS 77927 (S.D. Ohio June. 5, 2012); *see also Howard v. Calhoun County*, 148 F. Supp. 2d 883, 891 (W.D. Mich. 2001) ("There is no evidence of previous mishandled medical emergencies at the Calhoun County Jail. There is no evidence that defendants had notice of a 'plainly obvious' need to implement an improved policy or improve training of personnel.")

The following testimony is relevant to the issue at hand.

Nurse Dubber testified that prior to the death of Mr. Levert, she was not personally aware of any inmate who had experienced Xanax withdrawal to the point that they needed medical attention. (Tr. 52.) It was always the goal of the jail to make sure medications were properly verified to ensure continuity of treatment. (Tr. 53-54.) Furthermore, she was unaware of any prior instances of a death due to issues involving the verification of medication. (Tr. 54.) When asked whether the nursing staff had the requisite knowledge to detect the signs and symptoms of Xanax withdrawal, Nurse Dubber testified that they would be able to detect a problem, though they may not necessarily be able to diagnose that problem. (Tr. 53.) She testified that it would be appropriate for a nurse, in the exercise of her professional medical judgment, to bring information to the attention of a physician or psychiatrist if it was called for by the presentation of the patient. (Tr. 53.) She stated that in order for an inmate to receive benzodiazepine, it must be verified, or, in lieu of verification, the inmate would be referred to the mental health nurse who would, in turn, refer the inmate to the psychiatrist. (Tr. 35-36.) The patient would be seen by a psychiatrist within a day to a couple of weeks "depending on how the patient is presenting." *Id*.

Donald Kellon, M.D., a board certified psychiatrist employed by MMS to provide medical services at the County jail during the relevant time period, testified that verification of medication was performed by checking with a source other than the inmate, such as a doctor, pharmacy, or sometimes family members. (Tr. 65-67, 70.) He stated that it was the nurses' duty

11

to immediately verify medications so that they could be ordered in a timely manner.  (Tr. 71, 92-93, 96.)  This should be completed within 24 to 48 hours.  *Id*.  He testified that the nurses would have been aware of the importance of patients receiving their medications as prescribed.  (Tr. 92-93.)  In the case of Mr. Levert, he indicated that the procedure for verifying medication "wasn't followed and was not successful."  (Tr. 93.)  He was not aware of any codified policy indicating what should be done when a medication is not verified.  (Tr. 96-97.)  However, if verification was not achieved, he would expect professionals to "take the next step, which would be to say okay we're not having – we're not able to verify it, where do we go from here, and that's certainly what I would expect to follow."  (Tr. 99.)  He indicated that not everything a medical professional does in the performance of his job has to be reduced to writing.  (Tr. 99-100.)

When asked whether an inmate would receive a prescription drug prior to verification, Dr. Kellon replied, "[g]enerally not, but that would, I suppose, be at the discretion of the physician, depending on circumstances."  (Tr. 71.)  Dr. Kellon stated that under the booking guidelines in Exhibit 73, benzodiazepines would probably be included in the category of "antipsychotic drugs" under Roman numeral II, though technically they are not used to treat psychosis.  (Tr. 73-74.)  He testified that at the time of Mr. Levert's death, the decision to prescribe benzodiazepine's would ultimately rest with the treating physician.  (Tr. 77.)  When asked whether denying Mr. Levert his prescription Xanax for fifteen days was in keeping with the policy of the jail, Dr. Kellon responded that it was not in compliance with the policy.  (Tr. 80.)  Dr. Kellon did not believe that the verification guidelines prevented an inmate from receiving an unverified medication, indicating that a physician "is free to prescribe whatever he or she feels it is indicated without regard to any policy."  (Tr. 80-81.)  When pressed further on the issue, Dr. Kellon again denied that the guidelines prevented a doctor from prescribing medicine until after verification, noting that "[a] physician can prescribe medication at any time he or she feels it is appropriate to do so.  That's medical practice."  (Tr. 83.)

Dr. Kellon testified that on March 30, 2008, when nurse Jane Lawrence contacted him about Mr. Levert, he prescribed a "cocktail" consisting of Aldol, Ativan, and Benadryl, which included a benzodiazepine.  (Tr. 92-93.)  It is his understanding that the cocktail was never

12

administered.  (Tr. 91.)  He further stated that the nurse's decision whether to contact him and her decision not to administer the cocktail were an exercise of her professional judgment.  (Tr. 91-92.)

Dr. Knoll, an expert witness, testified that, on the day Mr. Levert was admitted, nurse Christine Maine noted his prescription for Xanax and attempted to verify it by sending a fax to South Pointe Hospital.  (Tr. 140-41.)  No relevant information was returned. *Id.*  Dr. Knoll testified that Dr. Alvarado, on the same day, performed a routine medical screening, which did not consist of a physical examination but rather only a review of Mr. Levert's file.  (Tr. 141.)  According to Dr. Knoll, Dr. Alvarado viewed Mr. Levert as stable at that single moment in time and took no additional action.  *Id.*  Two days later, Mr. Levert told correctional officers that he needed his medication.  *Id.*  The officers relayed Mr. Levert's complaint to medical assistant Cynnamon Ali and told her that they felt the complaint was legitimate.  *Id.*  According to Dr. Knoll, Ms. Ali told the officers that Mr. Levert would have to wait and would not receive any special treatment.  *Id.*  Three days later, on March 30, 2008, Mr. Levert's condition had become "extremely serious," and he was admitted to the mental health unit by nurse Jane Lawrence around 3:00 in the morning.  (Tr. 142.)  There is no mention of Mr. Levert's Xanax prescription or his vital signs in her evaluation.  *Id.*  Sometime later, nurse Joe-Anna Cooper took over for nurse Lawrence.  *Id.*  From 3:00 a.m. until his death around 10:00 p.m. on March 30, 2008, correctional officers note that Mr. Levert exhibited bizarre and vivid hallucinations, confusion, and severe agitation.[5]  (Tr. 142-43.)

Dr. Knoll testified that, in his professional opinion, Mr. Levert's death could have been averted by (1) the nursing staff placing a telephone call to the pharmacy that prescribed the drug to verify the medication, (2) providing a non-verified equivalent of the medication, (3) medical

---

[5]  While no real testimony was presented as to the employer of the nurses at the jail, it appears that nurse Maine, nurse Lawrence, nurse Cooper, and medical assistant Ali all worked for the County rather than MMS, as they are represented herein by counsel retained by the County.  MMS's attorneys represented doctors Kellon, Tuffuor and Alvarado.  Furthermore, the County's counsel acknowledged as much during closing arguments.

assistant Ali notifying the nursing staff when correctional officers informed her of Mr. Levert's condition, and (4) nurse Lawrence performing a proper mental status exam in the early morning hours of March 30, 2008. (Tr. 148-49.) Dr. Knoll opined that Mr. Levert's death was caused by failure to diagnose, monitor, and treat Xanax withdrawal. (Tr. 154.) He also believed that the jail's verification guidelines were "out of step with basic medical knowledge" because there was no reason for the policy to treat benzodiazepines differently than alcohol. (Tr. 165.) Dr. Knoll testified that he did not believe the verification guidelines contained in Roman numeral II, Exhibit 73, prohibited physicians from ordering medications that were not on the list, explaining that Guidelines are "not all inclusive, not limiting, but guiding." (Tr. 181.)

Dr. Tuffuor, the medical director at the jail since 2005, testified that an inmate who entered the jail with a prescription for benzodiazepines would have to have that prescription verified. (Tr. 196-97.) However, he testified that it was an "oversimplification" to suggest that a prisoner would not receive benzodiazepines until verification had occurred. (Tr. 197.) Dr. Tuffuor stated that, "if in the assessment, it is believed that a patient needs the medication right away, even prior to verification, then they would refer the patient to be seen by the doctor; at which time, the doctor would make a determination as to whether to go ahead and provide some intervention." *Id*. There was no fourteen day interval for an inmate to be seen by a doctor where an inmate is deemed unstable. (Tr. 208.) He testified that nurses were not expected to dispense medications, but were expected to realize when something was wrong with a patient and to send such a patient to the doctor. (Tr. 200-01.)

The County's expert witness, Alphonse Gerhardstein, a lawyer who represented the Levert family in the underlying case, testified that he believed MMS was deliberately indifferent because "every medical person ... who was asked is the withdrawal from benzodiazepine, from Xanax, a serious medical need, they all said yes. Everybody knew this." (Tr. 114.) Mr. Gerhardstein testified that "[e]verybody knew that [Mr. Levert] had withdrawal within three days," but pursuant to policy he was not set to be seen by a psychiatrist until fourteen days later. (Tr. 113-14.) Mr. Gerhardstein further testified that there was a "breakdown" in the verification policy as nobody ever followed up on the lack of response from South Pointe. (Tr. 114.)

14

Kenneth Kocevar, Director of Corrections, testified that he conducted a review after the death of Mr. Levert, and indicated that he believed the policies and procedures of the jail had been followed. (Tr. 60.)

The County argues that because the doctors who worked for MMS knew about the dangers of Xanax withdrawal, the verification guidelines were plainly and obviously defective. (ECF No. 266 at 11-29.) Not only must the policy itself – here the verification guidelines – be inadequate, but MMS employees must also have perceived a substantial risk to the prisoner, and then disregarded that risk. The County has not identified any previous instances of a breakdown in the verification process, let alone a breakdown as drastic as the one that occurred here. Furthermore, the County has not presented any evidence suggesting that there was an unwritten custom of failing to act when medication was unverified or that the nursing staff routinely failed to refer patients with unverified psychiatric prescriptions to the mental health nurse as called for by the express terms of the booking guidelines. Finally, the County has not presented any evidence that MMS was aware of regular deviations from the verification guidelines or that such deviations were ratified by MMS.

In fact, given the testimony discussed *supra*, the Court finds that it was not the verification guidelines that caused Mr. Levert's death. It was rather the failure of jail personnel, specifically the nursing staff, to follow the guidelines coupled with a breakdown in the medical care provided by the County's nurses. Dr. Knoll expressly testified that Mr. Levert's death was caused by a failure to diagnose, monitor, and treat Xanax withdrawal. (Tr. 153-54.) In other words, Dr. Knoll, in his professional opinion, believed that appropriate medical care would have prevented Mr. Levert's death. (Tr. 154-55.) Had the verification guidelines been followed, Mr. Levert would have been furnished with a supply of Xanax and/or been seen by the mental health nurse when he began experiencing withdrawal symptoms. Arguably, the verification guidelines' greatest shortcoming appears to be that it did not contemplate that County nurses would fail to follow up in a case where medication was not verified. It is unclear why Mr. Levert's medication was not verified, as there was little evidence presented at trial regarding the issue. Dr. Knoll noted that nurse Maine attempted to verify the Xanax prescription by sending a fax to

15

South Pointe Hospital.  (Tr. 141.)  There is no evidence of anyone making any further attempt to verify the prescription in an alternate fashion.  The County presented no evidence suggesting that the nurses were unable to verify Mr. Levert's medications due to some external factor beyond their control.  As such, based on the lack of evidence to the contrary, the Court can only conclude that the nurses charged with verification, either through inadvertence or neglect, failed in their duty to do so.  However, the Court cannot find that MMS was deliberately indifferent because it did not foresee or anticipate that the nursing staff would fail to take action when a medication went unverified, and compound that inaction by failing to refer a severely symptomatic inmate to a physician.

The County also ascribes significant weight to Dr. Knoll's testimony that the policy treating Xanax differently is out of step with basic medical knowledge.  Accepting such testimony at face value, however, still leaves the County far short of its burden of demonstrating deliberate indifference, which is "is characterized by obduracy or wantonness — it cannot be predicated on negligence, inadvertence, or good faith error."  *Wagle v. Corr. Med. Servs.*, 2012 U.S. Dist. LEXIS 119646 (E.D. Mich. Aug. 23, 2012) (internal quotation marks omitted) (*quoting Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012)).  Said testimony, at most, only serves to establish negligence or medical malpractice, but neither "negligence [n]or medical malpractice alone is insufficient to establish liability" under § 1983.  *Durham v. Nu'Man*, 97 F.3d 862, 868 (6th Cir. 1996) (internal quotation marks omitted).  In *Bruederle*, the Sixth Circuit classified plaintiff's argument – that the jail should have known he would suffer a seizure or should have taken more aggressive precautions – as "the language of medical malpractice, not deliberate indifference."  687 F.3d at 778.  Similarly, the County's focus on Dr. Knoll's testimony – that treating Xanax withdrawal differently than alcohol withdrawal is out of step with basic medical knowledge – also employs a medical malpractice standard and not the standard for deliberate indifference.[6]  Furthermore, *Bruederle* made no such finding when

---

[6]  MMS's medical malpractice insurance carrier, National Fire and Marine Insurance Company, did contribute to the settlement of the underlying action.  (ECF No. 153 at 6.)

16

considering a Xanax prescription and a strict verification policy. *Id*. While the various doctors all testified that they knew about the dangers of Xanax withdrawal, that alone fails to establish deliberate indifference. There was no evidence presented indicating that MMS perceived any risk to inmates with prescriptions for Xanax or similar drugs stemming from failure to follow the verification guidelines.

The Court does not ascribe significant weight to Mr. Gerhardstein's testimony that MMS was deliberately indifferent. Mr. Gerhardstein based his conclusion on his belief that everybody knew Mr. Levert was experiencing withdrawal symptoms within three days of his admission to the jail. The verification process, by that time, had already broken down. Furthermore, there is no evidence that any MMS employee was alerted to Mr. Levert's withdrawal symptoms. As acknowledged by Mr. Gerhardstein, Dr. Kellon was not contacted until five days had passed and Mr. Levert was nearing death. (Tr. 115.) His testimony overlooks the nursing staff's failure to administer the cocktail, which included a benzodiazepine, that Dr. Kellon prescribed. There is no testimony that Dr. Kellon's prescription, had it been followed, was so inadequate that it was tantamount to a failure to treat.

Mr. Gerhardstein also concedes that there was a "breakdown" in the policy of verification, which supports the Court's finding that Mr. Levert's death was not caused by the adherence to the verification guidelines but rather by the failure of non-MMS employees to follow them. Though Mr. Gerhardstein alleges a failure to train by MMS (Tr. 115), his testimony ignores the provision of the verification guidelines that calls for an inmate with unverified psychiatric medications to be seen by the mental health nurse. It also glosses over the fact that the County's nurses, in exercising their own professional judgment, could have scheduled a psychiatric visit much sooner but failed to do so. Part C of Exhibit 73 provides that when an inmate presents as urgent, an emergency sick call should be scheduled the same or following day. Furthermore, the verification guidelines did not prevent a licensed physician from prescribing unverified medication, as per the testimony of Drs. Kellon, Tuffuor, and Knoll. The Court finds Dr. Knoll's testimony that guidelines are not meant to supplant professional, medical judgment to be persuasive.

17

The Court also ascribes little weight to Director Kocevar's opinion that the policies and procedures of the jail had been followed, as it is contradicted by the evidence. The guidelines state that medications "should be verified" and, in the case of psychiatric medications that are unverified, there should be a referral to the mental health nurse. The nursing staff failed to verify the medication beyond sending a lone fax to South Pointe hospital. There is no evidence that the medication could not have been verified due to an external impediment. Mr. Levert was not referred to the mental health nurse.

The Court finds that the County has failed to demonstrate that the verification guidelines were consistently implemented to result in constitutional violations with explicit or implicit ratification by the County's policymakers. In many regards, this case shares several factual similarities with the *Bruederle* decision. Therein, the Sixth Circuit found no constitutional violation where a jail's verification policies were stricter than those enacted by MMS. *Bruederle*, 687 F.3d 771. Even so, Mr. Levert's death was caused not by any inadequacy attributable to the verification guidelines so much as the nursing staff's failure to follow them and/or their failure to address Mr. Levert's serious medical need when later manifested. The Court does not doubt that deliberate indifference occurred in the care rendered to Mr. Levert, making the County legally liable to respond in damages. However, the County has failed to present evidence tending to prove that MMS or its agents and/or employees acted with deliberate indifference. There was no testimony that breakdowns in the verification process were customary, that MMS knew of such breakdowns, or that MMS, either implicitly or explicitly ratified the same.

### c. Subsequent Remedial Measures

Although the County and MMS, after the death of Mr. Levert, amended their verification policy as it applied to benzodiazepine medications such as Xanax, the Court finds that the remedial policy enacted cannot be considered under Federal Rule of Evidence 407. ("When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction."); *accord Nolan v. Memphis City*

18

*Sch.*, 589 F.3d 257, 273 (6th Cir. 2009). Moreover, the mere fact that the new guideline may be a better policy, given the benefit of hindsight, does not render the previous guideline unconstitutional as written or as implemented.

### 3. Notice

An insured is entitled to indemnification if he demonstrates that he has given notice to the insurer. Defendant State Auto asserts that the County failed to provide timely notice. Because the Court finds that the County was not legally liable to respond in a § 1983 action for the acts or omissions of MMS, the issue of whether the County provided State Auto with timely notice is moot and the Court makes no findings of fact or conclusions of law on this issue.

### III. Findings of Fact and Conclusions of Law

The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil procedure 52(a)(1):

*Findings of Fact*:

- The County was an "additional insured" under the insurance policy State Auto issued to MMS.

- MMS, through its agents and/or employees, and on behalf of the County, promulgated the verification guidelines that resulted in the confiscation of Mr. Levert's prescription for Xanax.

- It is undisputed that Mr. Levert died from complications due to Xanax withdrawal.

- The verification guidelines, which provide for the confiscation of inmates' medication until they are either verified or prescribed by a jail physician/psychiatrist, are common in both correctional facilities and civil hospitals and are not facially unconstitutional.

- It was the obligation of employees of the County, specifically the nursing staff, to obtain verification that an inmate's medication was in fact being prescribed by a licensed medical practitioner. The nursing staff failed to follow up on the verification of Mr. Levert's Xanax prescription and failed to refer him to a mental health nurse in the absence of verification. Both these omissions constitute a breach of the verification guidelines, Exhibit 73.

- Despite being put on notice by corrections officers as early as March 28, 2008 that Mr. Levert was asking for his Xanax and exhibiting signs of withdrawal, the nursing staff failed to contact any physician, psychiatrist, or any agent of MMS until March 30, 2008. After County nurses finally spoke with an MMS agent/employee, Dr. Kellon, the nursing staff did not administer a drug cocktail to Mr. Levert as instructed by Dr. Kellon.

19

- The verification guidelines did not prohibit licensed physicians or psychiatrists from prescribing medications that they believed, in their professional, medical judgment, were necessary.

- There is no evidence that the nursing staff consistently failed to follow the verification guidelines or evidence that prior breakdowns in that process had occurred.  Furthermore, there is no evidence that MMS was aware of a custom of deviating from the guidelines or that MMS ratified such actions.

***Conclusion of Law***:

The County has failed to establish that the drug verification guidelines promulgated by MMS were facially unconstitutional.  Furthermore, the County has failed to demonstrate that said guidelines were consistently implemented to result in constitutional violations with explicit or implicit ratification by the County's policymakers, as it has failed to present sufficient evidence to prove that MMS or its agents and/or employees acted with deliberate indifference to Mr. Levert's medical needs.  Since no § 1983 violation on the part of MMS or its agents and/or employees was established, the County could not have been held liable for the alleged acts or omissions of MMS.  Therefore, the County is not entitled to indemnification as an "additional insured" under State Auto's general liability policy issued to MMS.

IT IS SO ORDERED.

s/ Greg White_____
United States Magistrate Judge

Date: October 25, 2012

20